**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

AMADEUS IT GROUP, S.A. and
AMADEUS s.a.s. (f/k/a AMADEUS
MARKETING S.A.R.L.),

                    Plaintiffs,

– against –

AMERICAN AIRLINES, INC., and
NORTHWEST AIRLINES, INC.,

                      Defendants.

---

Index No. 06 Civ. 6052 (LTS)

**COMPLAINT FOR**
**INJUNCTIVE RELIEF**

      Plaintiffs Amadeus IT Group, S.A. ("Amadeus IT") and Amadeus s.a.s. (a successor in interest to Amadeus Marketing S.A.R.L.) (jointly, "Amadeus") bring this action against American Airlines Inc. ("American") and Northwest Airlines, Inc. ("Northwest") (jointly, the "Airlines") and state as follows in support of their claims:

### NATURE OF THE ACTION

      1.    This is an action to compel arbitration and to seek preliminary relief pending the constitution of an arbitral panel pursuant to arbitration proceedings that have been initiated by Amadeus before the International Chamber of Commerce in Paris, France. Amadeus, a computerized reservations system that allows travel agencies the ability to review and book reservations on participating airlines, has initiated arbitration with respect to the breach by American and Northwest of the Participating Carrier Agreement ("PCA") between Amadeus and each of the Airlines.

2.      Specifically, Amadeus seeks an arbitral declaration that the Airlines will have breached the non-discrimination provisions of the PCA by implementing programs (the "Programs") that will discriminate against travel agents that use the Amadeus system relative to certain other computerized reservations systems. Under these Programs, Amadeus travel agents, but not agents that use certain competing reservations systems, will be forced to pay a surcharge to make bookings on those airlines and will face the prospect that Northwest will withhold some of its fares and other flight information from them. The breach of contract at issue will take effect on September 1, 2006, with the implementation by American and Northwest of these Programs.

3.      If allowed to become effective, the Programs will cause irreparable injury to Amadeus since, among other reasons, its agents will abandon the Amadeus system in favor of competing systems that will not suffer from the prohibited discrimination, and Amadeus will be unable to attract new agents to its system, resulting in the effective loss of its competitiveness in the U.S. market.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction under Section 203 of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, as codified in the Federal Arbitration Act (the "FAA") at 9 U.S.C. §§ 201 *et seq.* (the "Convention"), to compel enforcement of international arbitration agreements falling under the Convention. This case involves compelling arbitration and the determination of Amadeus' right to preliminary and conservatory measures pursuant to "[a]n arbitration agreement...arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention." 9 U.S.C. § 202. Further, the

nations in which one or more of the parties are citizens – the United States, France and Spain – are party to the Convention.

5.     This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(a)(2). Complete diversity of citizenship exists between Amadeus and the Airlines, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

6.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(c) because both defendants reside in and are subject to personal jurisdiction in this District.

7.     Venue is also proper in the District pursuant to § 204 of the Convention and 28 U.S.C. § 1391 because both defendants reside in and are subject to personal jurisdiction in this District.

## THE PARTIES

8.     Plaintiffs Amadeus IT Group, S.A. is a *sociedad anonima* organized and existing under the laws of the Kingdom of Spain.

9.     Amadeus s.a.s. (which succeeded to Amadeus Marketing S.A.R.L. following a merger between Amadeus subsidiaries) is a *sociéte par actions simplifiées*, organized and existing under the laws of the Republic of France. Amadeus s.a.s. engages in marketing and is wholly-owned by Amadeus IT.

10.    American Airlines Inc., a Delaware corporation, is a major U.S. airline based in Fort Worth, Texas with operations worldwide. American systematically and continuously transacts business in New York through the sale of airline tickets in the state and through the conduct of airline operations at airports in the state.

11.    Northwest Airlines Inc., a Delaware corporation, is a major U.S. airline based in Eagan, Minnesota with operations worldwide. Northwest systematically and continuously

transacts business in New York through the sale of airline tickets in the state and through the conduct of airline operations at airports in the state.

## FACTUAL ALLEGATIONS

12.     The factual allegations herein are drawn principally from the Declaration of Stewart Alvarez, sworn to on August 8, 2006, and the exhibits thereto, which are expressly incorporated herein by reference.

### The Competitive Travel Services Distribution System

13.     Amadeus is a global distribution system ("GDS"). It operates a computerized reservation system that is made available to travel agents and other businesses worldwide to permit the booking and purchase of airline services and other travel supplier services by travel agencies. Amadeus is an intermediary between, on the one hand, airlines that participate in its system and, on the other, travel agencies ("Subscribers") that use the system to make reservations (commonly known as bookings in the GDS industry) on those airlines for passengers.

14.     Subscribers to the Amadeus GDS are able to access the information from computers that are linked to the Amadeus GDS, to make bookings on the participating airline, and to take advantage of other travel services for the benefit of their businesses and their customers on the same terms as subscribers of other GDSs in which that airline participates.

15.     Airlines that participate in the Amadeus GDS pay Amadeus a booking fee for each booking made through Amadeus by participating travel agencies on behalf of their customers, the travelers. Such fees constitute the major source of Amadeus' revenue from its GDS services. Thus, the greater the number of agencies that use a particular GDS such as Amadeus, the more bookings that will be made on that GDS and the greater the GDS's revenues.

16.    Amadeus is one of the four major GDSs that operate globally, including in the United States. The other three major GDSs are Sabre, Galileo and Worldspan. In recent years, there have been some new entrants into the travel distribution sector, including firms such as G2 Switchworks and Farelogix. Most travel agencies enter into subscriber agreements with only one GDS, for there are numerous operational and financial reasons that render it impractical for all but a relatively small number of larger agencies to use more than one GDS. The GDSs therefore compete intensely for travel agency subscribers, often making so-called incentive payments to agencies as an inducement to participate in one GDS over another.

17.    The U.S. market share of GDS bookings for Sabre, Worldspan and Galileo are about 43%, 32% and 17% respectively. Amadeus' current market share in the United States is approximately 8% (representing over 31 million bookings annually). The share of the market held by the new entrant entities is not known, but is relatively small.

18.    Amadeus has developed a focused business plan designed to grow its U.S. market share in a setting in which the total number of bookings made by traditional travel agencies is declining and has made substantial investments in excess of $130 million in the United States market in recent years to develop its product and infrastructure and to enhance its local operations and market presence. Amadeus made these expenditures in reliance in part on the Airlines' continued provision to Amadeus subscribers of information and reservations services on terms equally as advantageous to them as to the subscribers of any other GDS, as required by their respective PCA agreements with Amadeus.

19.    The net cost to travel agencies of using a particular GDS is an important basis on which GDSs compete with one another to obtain travel agency business. If it costs a travel agency more to make bookings on a particular GDS than on others (or if the agency effectively

will earn less per booking using one particular GDS than others when all of its costs are considered), travel agencies will be less inclined to use that GDS for their bookings. Similarly, if a GDS is deprived of information about an airline's services relative to information provided to subscribers of other GDSs, its attractiveness to travel agency subscribers is significantly reduced.

20.    The availability to a GDS and its subscribers of airline information and reservations services, on the non-discriminatory terms offered by a participating airline, is a particularly important marketing tool for a GDS in obtaining and retaining travel agency subscribers. A GDS whose subscribers are discriminated against in comparison to the subscribers of other GDSs will be at a severe competitive disadvantage. Accordingly, GDSs bargain with airlines for express promises of non-discriminatory treatment for their subscribers, as reflected in each of the individual PCAs Amadeus entered into with American and Northwest.

**The PCA Agreements at Issue Contain Non-Discrimination Provisions**

21.    American entered into a PCA with Amadeus Marketing S.A.R.L. (now known as Amadeus s.a.s) in May 1989 ("American PCA"). (Alvarez Decl. Ex. A.) The American PCA was subsequently assigned to Amadeus IT. Amadeus has fully performed its duties under the American PCA. The American PCA provides that the agreement will remain in effect for a one-year term and thereafter unless terminated under notice provisions set forth in the PCA. The American PCA remains in effect, together with the attachments to it, which are updated on a regular basis.

22.    Northwest entered into a PCA with Amadeus Marketing S.A.R.L. (now known as Amadeus s.a.s) in February 1990 (the "Northwest PCA"). (Alvarez Decl. Ex. B.) The Northwest PCA was subsequently assigned to Amadeus IT. Amadeus has fully performed its duties under the Northwest PCA. The Northwest PCA also provides that the agreement will

remain in effect for a one-year term and thereafter unless terminated under notice provisions set forth in the PCA. The Northwest PCA remains in effect, together with the attachments to it, which are updated on a regular basis.

23. Consistent with the fundamental importance to Amadeus that airlines participating in its GDS offer its subscribers reservations services on as good terms as those provided to the subscribers of other GDSs, the PCAs entered into by Amadeus with both American and Northwest expressly prohibit either airline from discriminating against the Subscribers of the Amadeus GDS, relative to any subscribers of any other GDS, in the provision of information and reservations services.

24. The first substantive provision of the American PCA, Article 2.A.1, provides in pertinent part that American "*shall, at its own cost,* coordinate its information and reservations services with AMADEUS and shall take such other steps as may be required to *provide all AMADEUS Subscribers ... information and reservations services as advantageous as those provided to any subscriber of any other computerised reservation and ticketing system.* Such services shall include, but will not be limited to, passenger information, schedule, space availability, fares and fare information and procedures." (emphasis added.)

25. Article 2.A.1 of the Northwest PCA creates the same obligation on the part of Northwest.

**The Importance of American and Northwest to the Business of Amadeus Subscribers**

26. American is the largest airline in the world in terms of passenger bookings. According to the U.S. Department of Transportation, American has carried approximately 15% of all domestic passengers in the U.S. so far in 2006.

27.     Northwest is the fifth largest airline in the United States and also a critically important airline.

28.     Given that the vast majority of travel agency subscribers in the United States book significant numbers of flights on both American and Northwest, any subscriber agency receiving less advantageous information or reservations services from American and/or Northwest because of the GDS it used would be harmed financially and competitively. Such a subscriber would have a strong incentive to choose a GDS that is favored by American and Northwest.

**American and Northwest Announce New Surcharge Programs in Violation of PCAs**

29.     Notwithstanding American's obligation under its PCA to provide Amadeus Subscribers with reservations services as advantageous as those provided to any subscriber of any other GDS, on July 12, 2006 American announced what it calls its "Source Premium Policy." A description of this Program and the announcement of it ("American Announcement"), can be found on American's website and is attached as Exhibit C to the Alvarez Declaration. According to the Source Premium Policy, beginning September 1, 2006, American will impose a $3.50 surcharge on each net booked flight segment originated in the United States by Amadeus Subscribers. In contrast, American will impose no surcharge on Worldspan or Galileo subscribers which participate in certain so-called "opt-in" programs offered by those GDSs, or on any subscribers to new entrant GDSs, G2 Switchworks or Farelogix.

30.     Similarly, and notwithstanding Northwest's own obligation under its PCA to provide Amadeus Subscribers with reservations services as advantageous as those provided to any subscriber of any other GDS, Northwest followed American's lead and on July 21, 2006 announced what it calls its "Preferred Distribution Products Policy." This Program and the

announcement of it (the "Northwest Announcement"), can be found on Northwest's website and is attached as Exhibit D to the Alvarez Declaration. According to the Northwest Program, beginning September 1, 2006, Northwest will impose a surcharge, also in the amount of $3.50, on each net booked flight segment originated in the United States by Amadeus Subscribers. In contrast, Northwest will impose no surcharge on Sabre, Worldspan or Galileo subscribers which participate in certain so-called "opt-in" programs offered by those GDSs, or on any subscribers to new entrant GDSs, G2 Switchworks or Farelogix. Further, under the Northwest Program, that airline may withhold information on its services from GDSs such as Amadeus that are also subject to the surcharge.

31. The surcharges announced by American and Northwest are of a type that have never before been successfully implemented in the U.S. If implemented, they would be unprecedented and have significant implications for the U.S. travel services distribution system.

**American's and Northwest's Programs Are Discriminatory**

32. By imposing a surcharge on Amadeus agencies, or withholding content from Amadeus agencies, the Programs would violate the non-discrimination obligations in Article 2.A.1 of the Airlines' respective PCAs.

33. The American Announcement makes clear American's intention to discriminate among GDSs in the terms by which it provides reservations services to the subscribers of the different GDSs and to offer subscribers of the Amadeus GDS such services on terms less advantageous, *i.e.*, more costly, terms than are offered to favored subscribers using certain other GDSs, who would pay no such surcharge.

34. Similarly, the Northwest Announcement makes clear Northwest's intention to discriminate among GDSs in the terms by which it provides reservations services to the

subscribers of the different GDSs and to offer subscribers of the Amadeus GDS such services and information on terms less advantageous than are offered to favored subscribers using other GDSs.

35. In establishing the non-discrimination obligation, the American and Northwest PCAs make no distinction between GDSs that offer an opt-in program for agencies and those that choose a different pricing program. The PCAs instead flatly prohibit the provision to Amadeus subscribers of information and reservations services less advantageous than those provided to *any* subscriber of *any* other GDS, regardless of the economic terms that the airline may arrange with respect to bookings made by an agency that participates in another GDS.

**The Nature and Extent of the Threat Posed to Amadeus by the Airline Programs**

36. The Airlines' Programs would render it substantially more costly for Amadeus Subscribers to use the Amadeus GDS to book a given flight on American or Northwest than to book that same flight using a favored GDS service. By charging Amadeus subscribers more for reservations services than they charge agencies using services provided by other GDSs, and/or by withholding fare and other information needed for agencies to make bookings, the Airlines will create an incentive for travel agencies to switch to GDSs other than the Amadeus GDS.

37. Since all or virtually all of Amadeus' United States Subscribers regularly book flights on American, the impact of American's discrimination will be felt by virtually all of those Subscribers. Together, Amadeus' U.S. travel agency subscribers book just over 4.8 million total segments annually on American, based on 2005 volumes.

38. Similarly, all or virtually all of Amadeus' United States Subscribers regularly book flights on Northwest. As a result, the impact of Northwest's discrimination will be felt by

virtually all of those Subscribers. Together, Amadeus' U.S. travel agency subscribers book over 1.6 million total segments annually on Northwest, based on 2005 volumes.

39. The imposition by Airlines of surcharges under their Programs can be expected to result in a substantial decline in, if not elimination of, Amadeus' already relatively small share of the United States GDS market.

40. Because the vast majority of travel agents use the services of only one GDS, the threatened imposition of surcharges will operate to drive those agencies to other GDSs for all of their bookings, thereby causing Amadeus to lose all of its U.S. business for such agents, not merely its revenue from U.S.-originated bookings on American and Northwest. Amadeus will thus irreparably lose the ability to compete effectively in the United States and to grow as a competitor of the GDSs that already have a much larger U.S. market share. In fact, Amadeus subscribers are already raising questions with Amadeus about the Programs and expressing deep concern about this development.

41. In addition, the Programs will cause irreparable harm to the goodwill and reputation of Amadeus in the industry and to Amadeus' critical relationships with its subscribers, relationships that Amadeus has worked for many years to develop at great cost and with great effort. By making Amadeus less attractive to subscribers, the Programs also impair Amadeus' relationships with other participating airlines who rely on Amadeus for the distribution of their travel services.

42. The subscriber agreements that Amadeus maintains with U.S. travel agencies have terms that range between three and five years. Each year, roughly one-fourth of Amadeus' travel agent subscriber agreements expire. It would be nearly impossible for Amadeus to renew

those agreements if Amadeus' subscribers must pay the surcharges announced by American and Northwest.

43.     Since American's Announcement on July 12, 2006, numerous key Amadeus subscribers have expressed grave concern to Amadeus about the surcharges threatened under the Programs and the financial impacts of the Programs on those subscribers. It is highly unlikely that more than a few of these agencies will elect to remain as Amadeus subscribers should the surcharges take effect.

44.     Further, since American's Announcement, a substantial number of subscribers, having subscriber agreements expiring in July and August and typically making substantial bookings on Amadeus annually, have not yet renewed their agreements with Amadeus. Amadeus would normally have expected these agencies to have renewed their relationships by this time, and there is a significant risk that all or most of these agencies may not renew their agreements with Amadeus due to their concern over discriminatory surcharges announced by American and Northwest.

45.     Similarly, over the forthcoming period between September 1, 2006 and December 31, 2006 (the approximate time period over which Amadeus seeks an injunction in this Court), a significant number of additional subscriber contracts, representing a very substantial number of bookings on Amadeus annually, will expire. Also over that period, Amadeus would anticipate obtaining new agency contracts that would represent a substantial flow of new bookings to Amadeus on an annual basis. For the same reasons that Amadeus' existing travel agency customers would be induced to leave Amadeus rather than to renew their contracts with Amadeus if the Programs go into effect, Amadeus' ability to market to potential new subscribers would also be crippled.

46. In 2007, agency contracts representing millions of bookings on Amadeus annually are scheduled to expire. If Amadeus is unable to stop American and Northwest from implementing their contractually prohibited Programs, Amadeus' long relationships with these agencies will also be at substantial risk of permanent loss. Furthermore, any implementation of the Programs in 2006 would raise concerns among agencies scheduled for renewal in 2007 about Amadeus' continued ability to ensure that American and Northwest will continue reliably to provide Amadeus subscribers with reservations services on the best available terms.

47. Agencies that decline to renew their agreements would, in all or virtually all cases, enter new agreements with competing GDSs, which usually would be multi-year term agreements. Amadeus would also find it extremely difficult -- if not impossible -- to attract new subscribers as long as it is subject to discriminatory surcharges.

48. In addition, certain larger Amadeus subscriber agencies that already have agreements with more than one GDS would almost certainly switch their American and Northwest bookings to the other GDS if doing so would allow them to avoid surcharges under the Programs. In terms of bookings, these larger multi-GDS agencies account for as much as one-fifth of Amadeus' U.S. bookings. The loss of bookings from these agencies would be experienced almost immediately.

**Amadeus' Efforts to Deter The Breaches and Avoid the Need for an Injunction**

49. Amadeus wrote to American on July 21, 2006 to advise that the American Program was a violation of Article 2.A.1 of the PCA and to ask American to reconsider its program or, alternatively to hold it in abeyance pending arbitration, as provided under the PCA. American responded by letter yesterday refusing to delay implementation of its Program.

50.     Amadeus wrote to Northwest on July 28, 2006 to advise that the Northwest Program was a violation of Article 2.A.1 of the PCA and to ask Northwest to reconsider its program or, alternatively to hold it in abeyance pending arbitration, as provided under the PCA. Amadeus requested a response by August 3, 2006. Northwest responded on that date, claiming that it could discriminate against Amadeus relative to other GDSs that offered Northwest what it considered to be a better economic deal. Northwest also claimed, incorrectly, that any arbitration action would violate the automatic stay provisions of the bankruptcy laws since Northwest is presently in reorganization under Chapter 11 of the Bankruptcy laws.

**Arbitration Timeframes and Harm to Amadeus Absent Injunctive Relief**

51.     Article 18 of the American PCA and Article 19 of the Northwest PCA provide that any dispute arising out of or in connection with the PCA "shall be finally settled by arbitration under the Rules of Arbitration of the International Chamber of Commerce." The PCAs provide that the place of arbitration shall be Paris, France.

52.     Pursuant to the arbitration provisions of the Airlines' PCAs, on August 8, 2006, Amadeus filed a Request for Arbitration against American and a separate Request for Arbitration against Northwest with the International Chamber of Commerce ("ICC") Court in Paris under the ICC Rules. (Copies of the individual Requests for Arbitration against American and Northwest appear respectively at Exhibits H and I to the Alvarez Decl.)

53.     The preliminary injunction requested herein is an interim measure designed to prevent irreparable harm to Amadeus until the arbitral tribunal in each of the actions against American and Northwest can be constituted and has an opportunity to consider for itself whether to require maintenance of the *status quo* for the duration of each of those arbitrations.

54. The ICC Rules that the parties agreed would govern the resolution of disputes between them expressly contemplate that the parties may resort to any court of competent jurisdiction to obtain preliminary relief for the period before the arbitral panel is able to consider a request for preliminary relief. (*See* ICC Rules of Arbitration, Article 23 (titled "Conservatory and Interim Measures"), attached as Exhibit J to the Alvarez Decl.)

55. Resolution of each of Amadeus' separate claims against American and Northwest through ICC arbitration could take approximately fourteen months.

56. It will likely take up to four months until the two arbitral tribunals can be constituted and have an opportunity to consider for themselves whether to require the Airlines to maintain the *status quo* for the duration of the arbitration.

57. Unless Amadeus can obtain preliminary injunctive relief to stop the Programs from being implemented against Amadeus subscribers, Amadeus will suffer irreparable harm in the form of the loss of critical travel agency relationships that have taken years of effort and substantial resources to cultivate. The loss of reputation and goodwill to Amadeus will also persist if the Programs are allowed to become effective.

58. In comparison, if American and Northwest were temporarily enjoined from implementing the Programs against Amadeus subscribers (and only Amadeus subscribers), Amadeus agencies could continue to sell fares for American and Northwest using the Amadeus GDS -- just as they have been doing for many years. As a continuation of the long-established *status quo*, the harm to the Airlines from being required temporarily to delay implementation of the Programs would be small or non-existent.

## **FIRST CLAIM FOR RELIEF**

### **(Injunction in Aid of Arbitration Against American and Northwest)**

59.     Amadeus repeats and realleges each and every allegation set forth in paragraphs 1 through 58 above as if fully set forth in this claim.

60.     In each of its two PCAs with American and Northwest, the parties have agreed to arbitrate the disputes at issue here.

61.     Accordingly, Amadeus has initiated arbitration proceedings against both American and Northwest before the ICC.

62.     Amadeus will suffer irreparable harm on and after September 1, 2006 before the question of preliminary and conservatory relief can be considered in the arbitral process.

63.     Accordingly, pursuant to the ICC rules of arbitration agreed to by the parties, Amadeus is entitled to petition this Court for preliminary and conservatory relief until such time as the arbitral panels are constituted and can consider further relief for themselves under Article 23(2) of the Rules of Arbitration of the International Chamber of Commerce, effective January 1, 1998.

64.     If American and Northwest are not enjoined from implementing the Programs against Amadeus subscribers on September 1, 2006, there is a grave, immediate and substantial likelihood that Amadeus will suffer irreparable harm, thereby depriving Amadeus of its rights to a meaningful arbitration of its disputes with American and Northwest and of an important and substantive procedural right in such arbitrations (*i.e.*, the right to petition a court of competent jurisdiction for preliminary and conservatory relief prior to being heard by the arbitrators).

## SECOND CLAIM FOR RELIEF

### (Order Compelling American and Northwest To Arbitrate Under the PCAs)

65. Amadeus repeats and realleges each and every allegation set forth in paragraphs 1 through 64 above as if fully set forth in this claim.

66. By executing their respective PCAs, American and Northwest have agreed to arbitrate the instant disputes before the ICC under the ICC's rules.

67. Those rules expressly provide that Amadeus shall have the right to petition a court of competent jurisdiction for preliminary and conservatory relief.

68. Accordingly, to the extent that American and Northwest challenge or refuse to participate in this Court's consideration of Amadeus' entitlement to preliminary and conservatory relief pending arbitration, each is refusing to participate in the arbitral process and should be compelled to do so by order.

69. Alternatively, by refusing Amadeus' requests to delay implementation of the Programs until the arbitral panels can convene and consider Amadeus' entitlement to preliminary and conservatory relief -- a clearly defined right of Amadeus under the arbitral rules agreed to by the parties -- American and Northwest breach their respective arbitration agreements and are failing to resolve these disputes in accordance with ICC arbitration rules.

70. Northwest has also expressly indicated that it will not arbitrate this dispute with Amadeus, which represents a further breach of its agreement to arbitrate.

71. American and Northwest therefore should be ordered to arbitrate their disputes with Amadeus regarding the Programs under the arbitration provisions of the PCAs and to cooperate with all aspects of that procedure, including proceedings in this Court pending constitution of the arbitral panels that will ultimately hear these matters.

**WHEREFORE**, Amadeus respectfully requests that this Court:

A. Enter an order compelling American and Northwest to arbitrate the parties' disputes at the ICC under the Rules of the ICC and to cooperate with all aspects of that procedure, including proceedings in this Court pending constitution of the arbitral panels that will ultimately hear these matters;

B. Enter an order preliminarily enjoining American and Northwest, and their respective officers, directors, principals, agents, servants, employees, successors and assigns, and all those acting in concert with them, from implementing the Programs on September 1, 2006 or thereafter as against Amadeus subscribers, until such time as each of the two arbitral panels to be constituted by the ICC have considered the continued availability of preliminary and conservatory relief over the course of the arbitrations; and

C. All such other and further relief as the Court may deem just and proper.

Dated: New York, New York
August 9, 2006

STEPTOE & JOHNSON LLP

By: _____
John D. Lovi (JL-5928)
750 Seventh Avenue, Suite 1900
New York, New York 10019
(212) 506-3900

- and -

David H. Coburn
David A. Clark
Steptoe & Johnson LLP
1330 Connecticut Ave.
Washington, DC 20036
(202) 429-3000

*Attorneys for Plaintiffs*
*Amadeus IT Group, S.A.*
*and Amadeus s.a.s.*